Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| ANA NIDIA BLONDET TORRES<br><br>RECURRIDA<br><br>V.<br><br>JESÚS R. RAMOS PUCA; MIGUEL ÁNGEL CAMACHO RIVERA; IGLESIA METODISTA DE PUERTO RICO, INC.; IGLESIA METODISTA EL SANTUARIO; CENTRO DE SALUD FAMILIAR DR. JULIO PALMIERI FERRI, INC.; DR. FRANCISCO GÓMEZ GOYTÍA y LA SOCIEDAD LEGAL DE GANANCIALES compuesta por su esposa JANE DOE; **HOSPITAL MENONITA GUAYAMA, INC**.; DR. JAMES M. OJAGO MMBUKA y la Sociedad Legal de Gananciales compuesta con su esposa FULANA DE TAL; **SOUTH CENTRAL EMERGENCY GROUP, LLC**; CORPORACIONES A & B; DR. RICHARD ROE; **PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY**; COMPAÑIAS DE SEGUROS A, B, C, D, E, F, G, H, I, & J<br><br>PETICIONARIOS | TA2026CE00592 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Guayama<br><br>Caso Núm. GM2019CV00782<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez, Pagán Ocasio y la Jueza Álvarez Esnard.

Pagán Ocasio, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 5 de junio de 2026.

### I.

El 11 de mayo de 2026, el Hospital Menonita Guayama, Inc. (Hospital), South Central Emergency Group, LLC (SCEG) y Puerto Rico Medical Defense Insurance Company (PRMDIC) (en conjunto, peticionarios) presentaron una *Petición de Certiorari* en la que nos solicitaron que revocáramos la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Guayama (TPI o foro primario), el 13 de marzo de 2026, notificada y archivada digitalmente en autos el 16 de marzo de 2026.[1] Mediante dicho dictamen, el TPI declaró No Ha Lugar la moción de desestimación presentada por los peticionarios.

El 12 de mayo de 2026, emitimos una *Resolución* en la que le concedimos a la señora Ana Nidia Blondet Torres (señora Blondet Torres o recurrida) hasta el 21 de mayo de 2026 para exponer su posición sobre el recurso.[2]

El 18 de mayo de 2026, la recurrida presentó una *Oposición a Recurso de Certiorari* en la que nos suplicó que deneguemos la expedición del recurso peticionado.[3]

Con el beneficio de la comparecencia de las partes, damos por perfeccionado el recurso y procederemos a discutir los hechos pertinentes a la controversia ante nuestra consideración.

**II.**

El caso de marras tuvo su génesis el 18 de septiembre de 2019, cuando la señora Blondet Torres presentó una demanda sobre daños y perjuicios en contra de varias personas y entidades, incluido el Hospital.[4] Alegó que acudió a un bazar en donde sufrió una caída en una rampa cuya visibilidad estaba obstruida por unos estantes de ropa. Mencionó que, ese día, fue llevada a un centro de salud en

---

[1] Véase entrada núm. 250 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC-TPI).

[2] Véase entrada núm. 2 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA).

[3] Íd., entrada núm. 5.

[4] Véase entrada núm. 1 en el SUMAC-TPI.

donde le indicaron que no tenía fractura alguna. Empero, el dolor persistió por varios días por lo que acudió al Hospital en donde el doctor de turno le indicó que ello se debía a calambres en la cadera. Aun así, continuó con la molestia por lo que acudió a su médico de cabecera quien finalmente le informó que tenía una fractura en la cadera.

Por esos hechos narrados, la recurrida adujo que, entre otros, el Hospital y el doctor que allí la atendió fueron negligentes al no proveerles el tratamiento médico adecuado que ésta requería. Manifestó que, a causa de la caída, sufrió daños físicos, inconvenientes, limitaciones y angustias mentales por lo que solicitó una compensación por la suma de $350,000.00

Posteriormente, el 15 de julio de 2020, la recurrida presentó una *Demanda enmendada* y, el 14 de junio de 2021, presentó una *Segunda Demanda Enmendada*.[5] Mediante esta última enmienda, añadió como demandados, entre otros, al Dr. James M. Ojago Mmbuka (Dr. Ojago), SCEG y PRMD.

Tras varios trámites procesales, innecesarios pormenorizar, el 19 de septiembre de 2024, el TPI dictó una *Sentencia Parcial* en la que declaró Ha Lugar la moción de sentencia sumaria presentada por el Dr. Ojago y desestimó, por prescripción, la causa de acción incoada en su contra.[6]

Posteriormente y amparados en ese dictamen, el 31 de diciembre de 2025, los peticionarios presentaron una *Moción de Desestimación al Amparo de la Regla 10.2 de Procedimiento Civil*.[7] Alegaron que, la responsabilidad que se les imputa depende jurídicamente de la existencia de una causa de acción válida y exigible en contra del médico. Adujeron que, considerando la

---

[5] Íd., entrada núm. 70.
[6] Íd., entrada núm. 216.
[7] Íd., entrada núm. 237.

sentencia que desestimó la causa de acción en contra del Dr. Ojago, la reclamación en contra de los peticionarios no puede subsistir, como cuestión de derecho. Por lo que, suplicaron respecto a estos la desestimación, con perjuicio, de la *Segunda Demanda Enmendada.* Argumentaron que la responsabilidad imputada al Hospital y a SCEG se fundamenta en una teoría de responsabilidad vicaria por la alegada impericia del Dr. Ojago, sin imputaciones fácticas independientes.

Además, expresaron que la demanda adolece de alegaciones de negligencia específicas e independientes contra personal de enfermería, empleados, o políticas propias del Hospital o de SCEG. Asimismo, aludieron que no podrían instar una acción de nivelación en contra del Dr. Ojago, precisamente, por la desestimación de la reclamación en su contra.

El 2 de febrero de 2026, la recurrida presentó una *Oposici[ó]n a Moci[ó]n de Desestimaci[ó]n de Demandadas.*[8] En ésta, alegó que, entre el Hospital y SCEG había un interés común en proveer servicios a los pacientes a través del Dr. Ojago por lo que procedía concluirse que, entre estos, existía una solidaridad propia o perfecta. Así las cosas, adujo que, tanto el Hospital como SCEG le serían responsables frente a la recurrente, de probarse la negligencia en contra del galeno, aun cuando éste no esté en el pleito. Arguyeron, además, que los elementos de la causa de acción en contra del Hospital y SCEG están presentes en el caso por lo que la alegación 35 de la *Segunda Demanda Enmendada* cumple con el requisito de plausibilidad.[9]

---

[8] Íd., entrada núm. 242.
[9] La alegación 35 de la Segunda Demanda Enmendada lee como sigue:
> 35. Finalmente, el **Hospital Menonita Guayama, Inc. y/o South Central Emergency Group, LLC (SCEG)**, le son responsables a la demandante en forma vicaria por la negligencia del Dr. James M. Ojago Mmbuka, ya que la demandante acudió a dicho Hospital por la sala de emergencia esperando la mejor atención médica que requerían las circunstancias y no la recibió, y la demandada SCEG por ser la operadora y/o administradora de dicha sala de emergencia. (Énfasis en el original).

El 13 de marzo de 2026 y notificada el 16 de marzo de 2026, el TPI emitió una *Resolución* en la que declaró No Ha Lugar la moción de desestimación presentada por los peticionarios.[10] Concluyó que, el Dr. Ojago, el Hospital y SCEG estaban inexorablemente atados por un interés común y tenían entre sí relaciones frecuentes, lo cual son características intrínsecas de la solidaridad propia o pura. Por lo cual, determinó que, al estar presentes los elementos de la solidaridad propia en la relación del Dr. Ojago con los peticionarios, la recurrida estaba facultada para dirigir su reclamo, de manera individual, en contra de cualquiera de los obligados solidariamente. Ultimó que, dado que entre las partes demandadas existe una solidaridad perfecta, los peticionarios no están impedidos de instar una acción de nivelación en contra del Dr. Ojago.

Oportunamente, el 31 de marzo de 2026, los peticionarios presentaron una *Moción de Reconsideración.*[11] Reiteraron sus argumentos sobre que mantenerlos en el pleito los expone a una responsabilidad absoluta, sin posibilidad de redistribuir la culpa, toda vez que el tribunal desestimó la causa de acción en contra del Dr. Ojago, por prescripción. Por lo que, insistieron en que la demanda carece de viabilidad jurídica frente a los peticionarios.

El 6 de abril de 2026, la recurrida presentó una *R[é]plica a Moci[ó]n de Reconsideraci[ó]n.*[12] Arguyó que la moción de reconsideración no añadía nada nuevo ni alteraba los fundamentos en que se basa la resolución que impugnaban. Por lo que, suplicó que la misma fuese declarada No Ha Lugar.

El 9 de abril de 2026, el TPI denegó la moción de reconsideración presentada por los peticionarios.[13]

---

[10] Véase entrada núm. 250 en el SUMAC-TPI.

[11] Íd., entrada núm. 252.

[12] Íd., entrada núm. 253.

[13] Íd., entrada núm. 254.

Inconforme, el 11 de mayo de 2026, los peticionarios presentaron el recurso de *certiorari* de epígrafe en el que formularon el siguiente señalamiento de error:

**Erró el Tribunal de Primera Instancia al emitir determinaciones de hecho y conclusiones de derecho que son contrarias a sus propias determinaciones previas sobre la prescripción de la causa de acción contra el Dr. James Ojago Mmbuka basada en la relación de solidaridad impropia entre dicho médico y los Demandados-Recurrentes, así como sobre la inexistencia de una causa de acción subsidiaria que permita a las codemandadas instar una acción de nivelación en su contra.**

Alegaron que las determinaciones de hecho y conclusiones de derecho de la *Resolución* recurrida son opuestas a lo previamente resuelto por el TPI mediante *Sentencia Parcial* final y firme del 19 de septiembre de 2024. Argumentaron que, ninguna reclamación derivada contra el Hospital, SCEG o PRMDIC puede subsistir cuando la causa principal en contra del Dr. Ojago ha sido extinguida por prescripción. Además, arguyeron que, una vez desestimada la demanda en contra del Dr. Ojago, por prescripción, ni el Hospital ni SCEG pudieran instar una acción de nivelación y ambos quedarían privados de cualquier remedio interno de repetición o nivelación. Por último, manifestaron que no existen alegaciones de negligencia directas e independientes en contra del Hospital ni SCEF por lo que sostienen que procede la desestimación de la demanda respecto a sus personas.

Por su parte, la recurrida presentó su oposición a la expedición del recurso. De entrada, adujo que los peticionarios invocaron, por primera vez ante este Tribunal, las doctrinas de la ley del caso y de cosa juzgada y que no las mencionaron en la moción de reconsideración ante el TPI ni las presentaron ante dicho foro. De otro lado, de forma persuasiva, la recurrida citó varios casos con

hechos idénticos al de marras, tramitados en el foro federal, en los que se aplicó la doctrina local de autoridad aparente y de solidaridad propia. En definitiva, arguyó que el TPI no incurrió en error alguno al denegar la moción de desestimación.

**III.**

**A.**

El auto de *certiorari* es un remedio procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. ***Medina Nazario v. McNeil Healthcare LLC***, 194 DPR 723, 728 (2016). Es en esencia un recurso extraordinario por el cual se solicita a un tribunal de mayor jerarquía la corrección de un error cometido por el tribunal inferior. supra, pág. 729. Una característica distintiva del auto de *certiorari* es que se asienta en la discreción delegada al tribunal revisor para autorizar su expedición y adjudicación. ***IG Builders et al. v. BBVAPR***, 185 DPR 307, 338 (2012). No obstante, nuestra discreción debe ejercerse de manera razonable, y siempre procurar lograr una solución justa. ***Torres Martínez v. Torres Ghigliotty***, 175 DPR 83, 98 (2008).

Con el fin de que podamos ejercer de una manera sabia y prudente nuestra facultad discrecional, la Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, ***In re Aprob. Enmdas. Reglamento TA***, 2025 TSPR 141, pág. 63, 216 DPR __ (2025), establece los criterios que debemos tomar en consideración al atender una solicitud de expedición de un auto de *certiorari*.[14]

---

[14] Esta Regla dispone lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

Reiteradamente, el Tribunal Supremo de Puerto Rico ha expresado que en su misión de hacer justicia la discreción "es el más poderoso instrumento reservado a los jueces". *Rodríguez v. Pérez*, 161 DPR 637, 651 (2004); *Banco Metropolitano v. Berríos*, 110 DPR 721, 725 (1981). La discreción se refiere a "la facultad que tiene [el tribunal] para resolver de una forma u otra, o de escoger entre varios cursos de acción". *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *García López y otro v. E.L.A.*, 185 DPR 371, 394 (2012). En ese sentido, ha sido definida como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Citibank et al. v. ACBI et al.*, supra; *Medina Nazario v. McNeil Healthcare LLC*, supra, pág. 729. Lo anterior "no significa poder actuar en una forma u otra, haciendo abstracción del resto del Derecho". *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009); *Negrón v. Srio. de Justicia*, 154 DPR 79, 91 (2001); *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997). Ello, ciertamente, constituiría un abuso de discreción.

En ese sentido, el Tribunal Supremo de Puerto Rico ha establecido que "la discreción que cobija al Tribunal de Primera Instancia en sus determinaciones discrecionales es amplia, por lo que sus decisiones merecen gran deferencia". *Citibank et al. v. ACBI et al.,* supra. Cónsono con ello, es norma reiterada que "ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las

---

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

determinaciones de hechos formuladas por el Tribunal de Primera Instancia". ***Ortiz Ortiz v. Medtronic***, 209 DPR 759, 778 (2022); ***Santiago Ortiz v. Real Legacy et al***., 206 DPR 194, 219 (2021).

**B.**

El anterior Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141, aplicable a los hechos de este caso, establecía que, "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. En virtud de lo anterior, es norma reiterada de nuestra jurisdicción que, para demandar por daños y perjuicios, el demandante debe demostrar la existencia de: (1) un daño real; (2) una acción u omisión del demandado, la cual debe ser culposa o negligente; y (3) un nexo causal entre el daño real y la acción u omisión del demandado. ***Sucn. Mena Pamias et al. v. Meléndez et al.,*** 212 DPR 758, 768 (2023). Por otra parte, el Art. 1803 del precitado Código, ant. sec. 5142, disponía sobre la responsabilidad vicaria. En nuestro ordenamiento jurídico la responsabilidad de los hospitales "ha estado predicada en la doctrina de responsabilidad vicaria". ***Márquez Vega v. Martínez Rosado***, 116 DPR 397, 405 (1985).

En cuanto a la responsabilidad de los hospitales por las actuaciones de los médicos, la jurisprudencia ha reconocido que el hospital podrá responder vicariamente no solo por los médicos empleados sino también por aquellos que, aunque no son sus empleados son parte de su facultad y están disponibles para consultas con otros médicos. ***Núñez v. Cintrón***, 115 DPR 598, 606 (1984). Los hospitales responden, además, en conjunto con los concesionarios de franquicias exclusivas para prestar servicios en el hospital cuando cometan actos de impericia médica. ***Fonseca v. HIMA***, 184 DPR 281, 289 (2012), citando a ***Sagardía de Jesús v. Hosp. Aux. Mutuo***, 177 DPR 484, 514 (2009). Ejemplo de

ello son los concesionarios de anestesiólogos, radiólogos y proveedores de servicios de sala de emergencia. En ese contexto, el hospital responde por haber seleccionado a ese personal y por tenerlo ofreciendo servicios a los pacientes. Íd.

A tales efectos, el Tribunal Supremo ha sostenido que el análisis correspondiente en casos de alegada impericia médica debe partir de una determinación a los efectos de ver en manos de quién el paciente confió primeramente su cuidado médico: si en el hospital o en el médico. Si el paciente acude en primera instancia al hospital, éste responderá solidariamente con el médico por actos de impericia médica, independientemente de si este último es empleado del hospital o contratista independiente. ***Márquez Vega v. Martínez Rosado***, supra, págs. 406-407. En el mencionado caso, el Tribunal Supremo dispuso sobre la responsabilidad de un hospital por actos de impericia médica cometidos exclusivamente por un médico, no empleado de la institución, a quien esta le había concedido el privilegio de utilizar sus facilidades para atender a sus pacientes privados y fundamentó su determinación a base de cuatro criterios:

> En primer lugar, en esta clase de situación el hospital es el que "provee" el servicio del médico en particular, no teniendo el paciente usualmente opción o participación alguna en dicha selección. Hasta cierto punto se puede afirmar que en esta clase de situación el hospital le está "garantizando" al paciente que ese doctor, o cualquiera otro que lo atienda bajo esas circunstancias, es uno competente y apto para prestarle ayuda médica. Posiblemente debido a esa "garantía implícita" por parte del hospital es que el paciente acude a esa institución en particular y no a otra o a un médico en su oficina privada. En segundo término, desde el punto de vista del paciente, a quien él tiene "de frente" es a la institución como tal, no a médicos distintos e independientes los unos de los otros y del hospital. En otras palabras, frente al paciente que llega a sus predios y a la comunidad en general, el hospital hoy en día se proyecta como una institución de servicios médicos completos y no como una estructura donde

habitan profesionales de la salud que no tienen nada que ver los unos con los otros. Bajo estas circunstancias no es irrazonable el aplicar la doctrina de **"autoridad o responsabilidad aparente".** En tercer lugar, no hay duda de que cuando el "paciente" acude directamente al hospital la relación principal que se establece es entre éste y la administración del hospital. En esa situación, el médico es considerado un auxiliar del hospital, y la institución debe responder por el daño causado por el médico. Por último, a pesar de que el médico no empleado ser considerado como un "contratista independiente", no hay duda de que el hospital resulta principalmente beneficiado por la labor que realiza el médico, por lo que entendemos que la institución debe responder por los actos negligentes de aquél. Íd., págs. 407-408. (Énfasis nuestro). (Citas omitidas).

Bajo la doctrina de autoridad aparente, por tanto, se responsabiliza por daños a un hospital cuando el paciente ha acudido en primera instancia al hospital en busca de ayuda y ha entendido, o le han dado la impresión, que todos los facultativos médicos que le atienden son empleados del hospital, independientemente de que así lo sean o no. *Márquez Vega* **v.** *Martínez Rosado, supra.* En la práctica de la medicina el deber de cuidado hacia el paciente no sólo corresponde a su médico sino al hospital. *Núñez* **v.** *Cintrón, supra.*

### C.

De otra parte, en nuestro ordenamiento jurídico operan las obligaciones mancomunadas y solidarias. En cuanto a la mancomunada, cada deudor cumple con su parte de la deuda de manera independiente, mientras que, en una obligación solidaria, cada deudor tiene el deber de satisfacer la totalidad del crédito que posee el acreedor. *Otero Rivera v. USAA Fed. Savs. Bank*, 214 DPR 473, 492 (2024); *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 375 (2012).

En ***Fraguada Bonilla v. Hosp. Aux. Mutuo***, *supra,* pág. 377, nuestro Tribunal Supremo hizo una distinción entre la solidaridad propia o perfecta y la solidaridad impropia o imperfecta. La solidaridad propia o perfecta es aquella que fue pactada o de vínculo preexistente, mientras que la solidaridad impropia o imperfecta es la que surge cuando son varios los responsables de un daño extracontractual. Íd.

Por otra parte, la característica principal de la solidaridad es que cada cocausante tiene la obligación de responder frente al perjudicado por la totalidad de sus daños. ***Maldonado Rivera v. Suárez y otros****,* 195 DPR 182, 204 (2016). No obstante, el perjudicado podrá recobrar de cada cocausante demandado la totalidad de la deuda que proceda, porque los efectos primarios de la solidaridad se  mantienen. ***Fraguada Bonilla v. Hosp. Aux. Mutuo****, supra,* pág. 389. Esta relación entre los cocausantes se conoce como relación interna y en ésta podría tener lugar la acción de nivelación. ***Rodríguez et al. v. Hospital et al.****,* 186 DPR 889, 901 (2012).

En lo pertinente a la controversia, en ***Pérez Hernández v. Lares Medical Center,*** 207 DPR 965, 990 (2021), Tribunal Supremo resolvió que entre un patrono y su empleado existe una relación de solidaridad propia, distinta a la solidaridad impropia que ordinariamente existe entre los cocausantes de un daño extracontractual. En lo específico, el Tribunal Supremo resolvió como sigue:

> El régimen de responsabilidad presunta por hechos ajenos se fundamenta en la existencia de una relación de dependencia previa entre el patrono y su empleado donde el empleado, en el desempeño de su oficio, actúa para adelantar los intereses de su patrono. Es decir, ambos cocausantes están inexorablemente atados por un interés común y tienen entre sí relaciones frecuentes. No existe, por tanto, la ausencia de comunidad de intereses que justificó la

adopción de la doctrina de solidaridad impropia en el ámbito extracontractual en *Fraguada Bonilla v. Hosp. Aux. Mutuo,* supra, según el Art. 1802, *supra.* Por el contrario, *al interpretar conjuntamente los Arts. 1803 y 1804 del Código Civil, supra, la conclusión más lógica es que la responsabilidad que surja entre el patrono y el empleado sea solidaria, más en su vertiente propia.* V*eamos.*

*Primero, es forzoso concluir que los Arts. 1803 y 1804 del Código Civil,* supra, *necesariamente implican los efectos primarios de la solidaridad. Esto, pues la persona perjudicada puede exigir el resarcimiento de los daños tanto al patrono, según el Art. 1803, como al empleado, según el Art. 1802, o a ambos.* En particular, a pesar de que el Art. 1803 fundamenta la obligación de responder del patrono sobre su presunta culpa, el Código Civil a su vez no limita la porción que se le puede exigir a este. Por el contrario, el Art. 1803 llama al patrono a responder por la totalidad de los daños ocasionados por su empleado y así contempla la posibilidad del patrono repetir contra ese la cantidad que hubiese satisfecho al perjudicado. *Este derecho de repetición necesariamente implica la existencia de una relación interna que solo existe en las obligaciones solidarias.* De lo contrario, una persona perjudicada que decida ejercer su acción únicamente contra el patrono solo podrá recibir una indemnización parcial, correspondiente a la porción de culpa del patrono. Es decir, el patrono solamente respondería en proporción a su propia culpa y de ninguna forma estaría respondiendo por los actos de su empleado. No obstante, esta conclusión daría al traste con el texto claramente establecido en el Art. 1803. Peor aún, cuando consideramos en las disposiciones del Art. 1804 el derecho de repetición con el que cuenta el patrono, no serviría fin alguno si según el Art. 1803 el patrono nunca pagaría en exceso a la porción correspondiente a su propia culpa. No cabe duda, entonces, que el Art. 1803 del Código Civil instituye, lógicamente, una relación solidaria entre un patrono y sus empleados.

*Segundo,* es menester recordar que el Código Civil solamente clasifica las obligaciones como mancomunadas o solidarias de forma que la categorización de la solidaridad como propia o impropia responde al llamado jurisprudencial de llenar las lagunas jurídicas. En esta ocasión, *al resolver que los Arts. 1803 y 1804 del Código Civil,* supra, *establecen una relación solidaria entre un patrono y su empleado, esa norma de*

*solidaridad en realidad es una impuesta por ley. Por consiguiente, también rigen los efectos secundarios de la solidaridad propia codificados en el Art. 1091,* supra. Es decir, "[l]a interrupción de la prescripción aprovecha o perjudica por igual a todos los acreedores y deudores".[72] En lo pertinente a nuestra controversia, *los actos interruptivos del término prescriptivo realizados contra el patrono o el empleado perjudican al otro por igual.* [...]. (Énfasis en el original).

En *Rodríguez on behalf of P.V.M. v. Mennonite General Hospital, Inc.,* Civil No. 21-01286, 2023 WL 3902717 (D.P.R. June 7, 2023), con hechos idénticos al de marras, el Tribunal Federal para el Distrito de Puerto Rico aplicó la doctrina de autoridad aparente y concluyó que, entre las partes codemandadas existía una relación de solidaridad propia. Determinó que, estos estaban unidos por un interés común de proveer atención médica a la demandante y a su hijo.

En ese caso, los demandantes alegaron que el hospital, así como el doctor que atendió al paciente fallaron en reconocer, manejar y tratar la condición respiratoria, la cual fue la causa próxima del daño neurológico severo e irreversible que éste sufrió. Por lo cual, alegaron que el hospital era responsable vicariamente por los actos u omisiones negligentes en que incurrió el personal médico que lo atendió, incluido al doctor codemandado. El foro federal concluyó que, tanto el hospital como el doctor podrían resultar responsables de la totalidad de los daños sufridos por los demandantes si se demostraba la negligencia. Esto, independientemente de que el doctor no fuera parte en el pleito. Por ello, denegó la solicitud de desestimación sumaria presentada por los codemandados.

**IV.**

En el presente caso, el TPI rechazó desestimar la demanda respecto a los peticionarios, quienes argumentaron que, por la

desestimación de la causa de acción respecto al Dr. Ojago, la recurrida carece de causa de acción en contra de estos. Esto, según alegan, por ser la reclamación en contra del galeno la principal.

Mediante el recurso que nos ocupa, los peticionarios señalan que el TPI hizo determinaciones de hechos y conclusiones de derecho incompatibles con la *Sentencia* mediante la cual se desestimó la reclamación respecto al Dr. Ojago por, prescripción, que, en su interpretación, se basó en una relación de solidaridad impropia entre el Dr. Ojago y los peticionarios. Alegan que, dado a que la causa de acción en contra del Dr. Ojago prescribió y dejó de ser exigible, ésta no puede servir como fundamento para imponer responsabilidad indirecta, vicaria o derivada a terceros.

En cambio, la recurrida sostiene que actuó correctamente el TPI en la aplicación de derecho al denegar la moción de desestimación de los peticionarios. Pues, aduce que, en este caso, existe una relación de solidaridad propia o perfecta entre los peticionarios.

Tras un análisis objetivo, sereno y cuidadoso del expediente, en correcta práctica adjudicativa apelativa, a la luz de los criterios esbozados en la Regla 52.1 de Procedimiento Civil, *supra*, y en la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, resolvemos que procede expedir el auto de *Certiorari*, confirmar la *Resolución* recurrida y devolver el caso al foro primario para la continuación de los procedimientos.

Según del derecho pormenorizado precedentemente, bajo el Artículo 1803 del Código Civil, *supra*, el hospital responde vicariamente por los actos de aquellos médicos que son sus empleados; por aquellos médicos, que, aunque no forman parte de su fuerza laboral, son parte de la facultad o *staff* y por los médicos pertenecientes a concesionarios de franquicias exclusivas para prestar servicios en el hospital, como lo son los proveedores de

servicios de sala de emergencia. ***Cruz Flores et al. v. Hosp. Ryder et al.***, supra, pág. 487-488.

De los hechos en este caso, surge que, la recurrida acudió a la sala de emergencias del Hospital y allí recibió atención médica por parte del Dr. Ojago. El galeno fue contratado por SCEG quien opera la sala de emergencias del Hospital en virtud de un contrato con este último. No surge de las alegaciones que la recurrida haya sido quien eligió al Dr. Ojago para que la atendiera. Por el contrario, la recurrente compareció a la sala de emergencia del Hospital a buscar asistencia médica. Fue el Hospital quien asignó al médico que intervino con ella.

En el caso de marras, colegimos que existe entre los peticionarios un interés común, pues el Hospital resulta beneficiado de los servicios que provee el médico a la institución y entendemos que existe una presunción de que el Hospital responde vicariamente por los alegados actos de mala práctica profesional del Dr. Ojago. Por consiguiente, también rigen los efectos de la solidaridad propia. Contrario a lo alegado por los peticionarios, determinamos que las alegaciones son suficientes para establecer una causa de acción por responsabilidad vicaria en contra de los peticionarios, aun cuando se desestimó la acción respecto al Dr. Ojago.

Los peticionarios citan en apoyo de su posición el caso de ***Maldonado Rivera v. Suárez y otros,*** supra, sin embargo, dicho caso es distinguible del presente. En ese caso, el Tribunal Supremo resolvió que, una vez prescrita la causa de acción a favor de un cocausante, éste no está sujeto a responderle al perjudicado ni tampoco a los cocausantes demandados mediante una acción de nivelación. Empero, en el caso de marras, entre las partes existe una relación estrecha que no fue impuesta por ley. Por lo que, distinto al mencionado caso, aquí obra la solidaridad propia y la recurrente

podía instar su reclamo tanto al médico que la atendió como al hospital, por este último responder vicariamente.

La doctrina de autoridad aparente establece que "los hospitales y médicos son directamente y solidariamente responsables ante una víctima de mala práctica cuando el perjudicado acude directamente a un hospital para recibir tratamiento médico y el hospital provee o designa a los médicos que la atienden.

La clave es identificar a "quién confió el paciente su salud, si al hospital o al médico." Véase lo resuelto en ***Rodriguez on behalf of P.V.M. v. Mennonite Gen. Hosp., Inc.***, supra. No hace distinción si quien lo atendió era empleado del hospital o no. Íd.

Por lo tanto, el foro primario no erró al rechazar desestimar la reclamación en contra de los peticionarios. Por el contrario, actuó correctamente en derecho. Por consiguiente, expedimos el auto de *certiorari* y confirmamos la *Resolución* recurrida.

**V.**

Por los fundamentos pormenorizados, se expide el auto de *certiorari,* y se confirma la *Resolución* recurrida. Se devuelve el caso al foro primario para la continuación de los procedimientos, conforme a lo aquí resuelto.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones